Benjamin Woodhouse
Havensight Capital LLC
2369 Kronprindsens Gade,
Suite 8-309
Charlotte, VI. 00802
805 478 1958
California Bar #261361

## THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

Havensight Capital LLC, A
USVI Limited Liability
Corporation

        Plaintiff,

Facebook,Inc., A Delaware
Corporation,

Does 1 to 10

        Defendant

) Case No.:
)
) **Plaintiff's *Complaint.***
)
)
)
)
)
)
)

## Complaint.

## Jurisdiction and Case History

The United States District Court of the Central District of California has personal, and subject matter jurisdiction over this matter, as it relates to a federal question of law. *28 U.S.C. Section 1331.* The

1                           *Complaint*

alleged tort of *Civil Rico*, here, is based on a Federal Statue, and the tortious conduct alleged speaks to violation of this Federal Statue. *Id. 18 U.S.C. Section 1964*. The Defendant, here, Facebook Inc. is a citizen of Delaware, Ireland, and California. The Plaintiff, here, is a citizen of the U.S.V.I. The Central District Court of California, here, initially determined that, the Plaintiff, Havensight Capital LLC ("Havensight Capital"), was a dual citizen of California, after Havensight Capital's initial filing, in case 2:15-cv-03758, on May 19th 2015. The Case, there, was dismissed with prejudice procedurally for lack of subject matter jurisdiction, without any adjudication of any of the substantive issues involved in the case, and before the pleading stage. *See Court Record.*

Next, the case was filed in the Superior Court of San Luis Obispo County, on October 28, 2015. The Court transferred the action, on Facebook Inc.'s unconferred

2                          *Complaint*

upon *Motion for Transfer*, to the Court of San Mateo County. *Model Rules of Attorney Conduct*. The California Superior Court of San Mateo subsequently granted Facebook's Second filed *Demurrer*, stating that Havensight Capital had procedurally inadequately stated alleged damages. Thus, there was no adjudicatory ruling in the State court, on the substantive matter, and the Case has yet to, either, be heard, or, ruled upon, based on the merits. *Bunker v. Ramo Corp. v. United Business Forms Inc.*, 713 F. 2d 1272 (1983)(Subject matter jurisdiction dismissal is not a judgment on the merits.) See also, *Peartree v. U.S. Postal Service*, 1995 WL 36429.

Moreover, Havensight Capital brings the action now, here, in Federal Court, as the tort of *Civil Rico* has been alleged, in addition, and is derived from newly attached recent evidence of Facebook's related tortious conduct. *Id*. Havensight Capital, here, alleges in its *Complaint* that Facebook misrepresented website click data on its metrics tool to Havensight Capital, and

3                           *Complaint*

that its inordinate deviations in ad pricing, in addition to the product's alleged defect, surmount allegedly to vertical price fixing.

Since, Facebook had its *Second Demurrer* granted in State Court, there have been two recently published articles, here, which speak to this tortious conduct. They are attached as *Exhibit I*, and *Exhibit J.* One article alleges that Facebook's video ad data is inflated, which Facebook also later admitted to. Whereas, another recently published article states that Financial analysts have found that Facebook has been representing ad click markets to substantially include more people than actually exist in a given country at a point in time.

Further, these two new articles, both, are newly discovered evidence that Facebook allegedly engages in: *price fixing*, *unfair business practices* through the misrepresentation of its ad sales, and *Civil Rico*. Thus, Subject matter jurisdiction is now proper, here, and it is in the interest of justice for the Court to

hear this *Complaint*.   This is because none of the claims have been substantively adjudicated, here, and there are new Federal question claims brought, which are derived from newly discovered evidence, which supports the torts, here, alleged. *Melendes v. City of Los Angeles*, 40 Cal. App. 3d 718 (2d Dist. 1974). (Prior judgment may not bar a later suit if there is, [either], new facts, or, circumstances).   Moreover, the alleged torts in this case, involve a close to Trillion dollar defendant, and speak to allegations which affect a majority of small businesses in the United States. Thus, this Case has tremendous economic and social implications, and should be properly heard by a Jury.

**Venue**

Venue is proper, here, because both parties serve customers that are located, in the County of Los Angeles. *28 U.S.C. Section 1391*.   Further, the alleged

defective ads were also purchased in the County of Los Angeles by Havensight Capital's manager.  *Id*.

## **Parties**

The Plaintiff, Havensight Capital, is a Limited Liability Company and has an address at 2369 Kronprindsens Gade, Suite 8-309, Christiansted, VI. 00802.  Attached, is a Certificate of Existence for Havensight Capital.  *Exhibit A*.  The Company has an agent of process and mailing address, at 5030 Anchor Way, Christiansted, VI. 00820.  Mr. Benjamin Woodhouse is the owner, and manager of Havensight Capital LLC, and Mr. Donovan Hamm, attorney at law, is the incorporator of Havensight Capital LLC.

Facebook Inc. is a Delaware Corporation, and has headquarters, at 1601 Willow Rd., Menlo Park, CA. 94025, and at 4 Grand Canal Square, Dublin, Ireland.

The Company has an agent of process, at C.S.C. 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA. 95833.

## Statement of Facts

The Plaintiff, here, Havensight Capital, owns and operates a number of consumer product companies, including: a soccer brand, golf brand, men's razor company, website design company, and a financial convenience company.  Plaintiff owns and operates websites to retail and promote such products. Havensight Capital has around 200 store customers, and serves retail, and individual customers, around the World, in almost every continent, with a multitude of consumer products.  These sales are accomplished through valid contractual relations, created: online, over the phone, and in person.  Havensight Capital relies primarily, on online advertising to market its products, and services.  Havensight Capital has transacted sales online, and has made definitive

economic gain from online business operations. Havensight Capital's existence is dependent, on, both, placing online advertisement to drive sales, and recording acquisition data, to understand the unique acquisition costs, associated with marketing its products.  This information is centrally used, both, in the Plaintiff's business decision making, and in its Venture capital raising initiatives.

The Defendant, here, Facebook Inc., is currently the only viable social networking option of notable scale for business online advertising.  It is also the only option, and has zero competition for online marketing, which incorporates product visuals.  Google, and Bing, only offer keyword advertising, respectively, and, Twitter, only, offers mobile advertising, with visuals.  Alphabet Inc. is the owner, and operator of the Google titled product, Google Analytics.  Facebook Inc. regularly advertises its business online ad product, and describes Facebook Ads manager as a tool,

"to attract customers to your business."  It represents this on its site, and through other marketing channels. Thus, Facebook has, both, actual, and constructive notice, that the product is used to form, both, actual, and potential, business contracts with individuals, and other businesses.  Facebook also invites business ad customers onto its physical servers, to create and execute business ads, thus Havensight Capital, here, was an invitee, in the same manner, that, either, a restaurant customer is, or any customer that enters the premises of a business for the purpose of consuming, either, products, or, services.

Facebook customers, here, are provided a price per website click by the Company, only after purchasing the online business advertisement, and are allowed to see the total website clicks generated from the purchase of the Facebook ad.  A customer is blind to final pricing, at the onset.  This randomly after purchase generated pricing is, both, clandestine, and non-transparent.

9                          *Complaint*

Facebook presents this information through its tool, entitled "Ads Manager."  Conversely, Google, provides customers with a tool called Google Analytics, which measure all of the website clicks from all online traffic in the entire universe to a website.  Thus, a Google Analytics count should never be less than the website clicks presented through Facebook Ads manager for the same site, over the same duration.  The Plaintiff uses both Google Analytics and Facebook Ads manager, collectively, and concurrently, to analyze online data related to its consumer businesses and online advertising.

The Plaintiff purchased online ads on Facebook for its business, with the sole purpose of gaining website visits to a single specified website address, on the following dates: Nov. 11, 2013, Jan. 28, 2014, July 11, 2014, March 13,2015, March 23, 2015, May 14th, 2015, and May 24th, 2015.  The Plaintiff went onto Facebook and sent its business images, and various business ad

10                          *Complaint*

texts, onto Facebook's servers, in order for Facebook to publish such business information through its physical servers, as a result of the purchase and placement of its ads.


The Plaintiff, here, was shocked, and outraged to find that Google Analytics data did not reconcile at all, with Facebook data over the same periods, and that Facebook's visit count was bizarrely substantially much higher, close to 30% higher, than the Google represented data, even though Google Analytics measures the total visits, and not just visits from the Facebook website ad, as Facebook Ads manager does.  It is actually not possible to determine the actual over inflation, as the Plaintiff does not know how many visitors came to the site independent of the Facebook advertisement.  We do know that the over inflation is at least close to 30%, material, and substantial, and could be far greater, depending on the number of non-ad related clicks, potentially even in the 50% range.

*Complaint*

This over inflation rate was observed, and witnessed by Plaintiff counsel over multiple periods, on every date that ads were published by Facebook's Ads manager.  Thus, there was a systematic and continuous pattern of alleged fraud witnessed.  The Plaintiff also, here, captured screen shots, and has attached them for the Court, which demonstrate this over inflation.  The Exhibits involve the Plaintiff's most recent campaigns, and are attached as *Exhibits B, C, D, and E*.  The screenshots were captured by two different expert computer technicians, one in Mumbai, India, and one in San Luis Obispo, California.  The Plaintiff's manager also oversaw both technicians, while the screenshots were taken.  Google, and Facebook, both, here, update data reporting, on a real time basis, and the second screenshot, reflects both companies' reported numbers for a single day frozen in time.  Thus, there is no reasonable and innocent explanation for these wild discrepancies, and over inflation, in

*Complaint*

the reporting data, other than one of the respective companies, having a defective product.

In *Exhibit B*, here, reflected is data collected from a campaign, through the dates of May 17, 2015, to May 17th, with the reading taken simultaneously at the very beginning of May 18th, 2015.  There is a difference, here, of 378 visits, vs., 342 visits for Google, which collects all visits, and not just visits from Facebook like the Facebook Ads manager does. Additionally, in *Exhibit C*, here, data is reflected for the single date of May 26, 2015, Facebook Ads manager reported 819 visits, vs., the 645 visits, which Google reported for the exact same duration.

Google reports both users, and sessions, with sessions being higher, and the total number of visits, including repeat visitors.  Thus, it is the semantic equivalent to overall website clicks, and it is the larger sessions numbers that is presented to the Court,

13                        *Complaint*

in the numbers for both these exhibits.  The Defendant cannot claim that the purposeful semantic of sessions, and website clicks are materially different, as they are not, they are identical.  Further, the Plaintiff has also witnessed Google Analytics capturing sessions of less than one second, and including spam bots in its sessions count, which makes these witnessed gross inflations even further disconcerting.

Additionally, Facebook charged the Plaintiff $.67 a click for the campaign involving data from the first screen shot, around March 17, 2015, and then magically charged the Plaintiff $.25 a click for an identical ad, in the very most recent campaign, which contains the data, around May 26th, 2015, reflected in *Exhibit D*, and *E*.  This is a 300% price differential, which is totally unacceptable.

Moreover, this ridiculously variable pricing differential, which is vertically offered to the Plaintiff, here, is based on dollars per website click,

14                          *Complaint*

which the Plaintiff, here, already has alleged to be improperly recorded.  Therefore, vertically, Facebook is offering its customers, the only product available in the industry, at a price point, which is determined after purchase, allegedly improperly recorded, and offered at a 300% differential.

Since Havensight Capital, here, filed its original *Complaint*, the Defendant, Facebook, here, has retained the same counsel as Alphabet Inc., which operates Google Inc., and has invited Alphabet Inc.'s Google to join them, in a server examination project called the "OCP" project.  *Exhibit H.*  Thus, Facebook has engaged horizontally in communications, with probably its only trillion dollar competitor, and counterpart, in the online ads industry.  The online ads industry would be defined as: service providers that offer online advertising for purchase, to small businesses, which present data to potential customers across the entire World Wide Web.

*Complaint*

There is no evidence from the Defendant's alleged defective pricing scheme that other competitors are forcing the Defendant to offer products, at market equilibrium as a result of competition.  Also, the Defendant offers no mechanism for a system of checks, and balances to demonstrate the pricing offered to similarly situated customers is the same, in its Facebook Ads manager product.  Havensight Capital further alleges that Alphabet Inc., and Facebook Inc. may through its operation as one, communicate around online ad pricing, and work collusively to unfairly price online ad products, which are consumed by small businesses, which are the very backbone of our economy.

This alleged communication includes, but is not limited to: memos on pricing, between leaders of the respective companies, and price information passed verbally from respective employees, while working together on Google and Facebook collaborative company

*Complaint*

projects.  This includes private communications, with

independent contractors, in private sessions.

Havensight Capital also alleges that Google and

Facebook do not adequately take appropriate step to

protect confidential pricing information from anti-

trust competitors.  The Defendant's alleged defective

pricing, and alleged defective product could be a

result of its insulation from market forces, as a

result of its persuasive position, in the political

arena.  The Plaintiff alleges that the Defendant's

business ad product is far from exceptional, as a

result of pricing variability, and alleged defective

website reporting, and alleges that any monopolistic

girth is not a direct result of its Facebook product's

superiority.


     Furthermore, Havensight Capital, here, required

when this *Complaint* was originally filed that customers

use individual accounts, to access the business

advertising tool of Facebook Inc.  Users were not able

to create Facebook accounts, without also creating, and consuming a personal individual Facebook profile. Thus, no boiler plate and fraudulent language on Facebook's site was ever agreed to, here, by Havensight Capital, and only at best, agreed to by Mr. Benjamin Woodhouse, as an individual, before Havensight Capital was even in existence.  This restrictive tying of products has since been remedied by the Defendant, after the Plaintiff initially filed this *Complaint*. Customers can now, after the original *Complaint* was filed, sign up, as a business for business ads, and agree to the terms of disclosures as an agent of the business.

Moreover, the Defendant, however, still unfairly restricts products, as it restricts customers from only advertising one product, and one Company at a time. Specifically, only brand cover picture is allowed for any business ad purchase, and this makes purchasing ads

18                                    *Complaint*

along business lines to be: inefficient, unfairly

costly, and further horizontal price restrictions.


Further, the Defendant, here, allegedly sent

independent contractors to harass and intimidate the

counsel, and manager for the Plaintiff.  Specifically,

the Defendant sent such individuals, into the Bet

Tzedek Ball, a gathering of professional colleagues.

There, the Plaintiff had to entertain a hired forensic

expert the entire night, and was followed into the

bathroom, and threatened verbally, by a contractor, en-

route to the restroom.  Such conduct embarrassed the

Plaintiff to his colleagues, and potential customers,

thus again interfering, with potential customer sales,

and valid contractual relations.  Further, the

Plaintiff continues to witness, either, the

Defendant's, or, its contactors, army of young female

claimant researchers, and coupled forensic experts,

first hand, and on a continual basis, and sees no

legitimate purpose to their continued participation, in this matter.

Additionally, attached, as *Exhibit F*, is a CNET article, in which the head of Facebook European marketing, in his own words, explains how many of Facebook's advertising products are defective.  He also states that many of the products should be removed from the market.  A second article, *Exhibit G*, describes how the CEO of Facebook, Mark Zuckerberg, here, purports to provide free internet to the indigent, when in fact, he really is providing them with select Facebook websites, with the intention of extracting fees from them in the future.

Mr. Zuckerberg makes annually, over $20 billion, in salary compensation, primarily off of this one revenue generating Facebook Inc. product, at issue.  The Defendant, here, however, did not file any evidence of independent, and strict calibration, and product

testing regimes, in the initial proceeding.  Instead, the Defendant, here, attempted to beguile the Court with procedural challenges, prevailing on a subject matter jurisdiction challenge.


The Plaintiff alleges that the Plaintiff relied on the data reported, in these purchased business ads, and on the alleged fraudulent pricing schemes, provided by the Defendant, to make business decisions, and to engage in Venture Capital raising.  The Plaintiff, here, engaged meetings with multiple Venture capital firms.  Such data, and pricing, are critical to any capital raising process for a consumer products company, and also affects the ability for a Company, to: launch products, identify the viability of business opportunities, and to allocate resources to product lines.


Further, Venture leaders rely on these customer acquisition costs, and generated online sales, to

determine whether, or, not, to allow a startup company, access to capital.  The Plaintiff had multiple Venture Capital funding requests denied, as a result of this alleged conduct, and also mis-allocated business resources, as a result of the Defendant's alleged fraudulent conduct.  Specifically, here, on March 5th, 2017, Havensight Capital contacted Mr. Jeremy Liew of Lightspeed Venture Capital, which specializes in investment in consumer products companies, similar to those owned by Havensight Capital.  Recently, Light Speed Ventures invested in the Honest Company.  Mr. Liew cited inadequate customer acquisition data as a reason why Lightspeed would not pursue further negotiations, here, for investment with Havensight Capital.  This act alone, here, is evidence of an attempt to generate capital for business purposes for economic gain around Havensight Capital's consumer product companies.  Thus, a taking of the Plaintiff's company, across all of its five major business lines,

has allegedly occurred, here, as a result of this alleged improper behavior by Facebook Inc.

Finally, in *Exhibit I*, and *Exhibit J*, we attached two recently published articles that further lends support to Facebook's engaging in Unfair business practices by making misrepresentations, and attempting to inflate the success, and even viable operation of its products.  The first article, here, states that Facebook's video ads, which was not purchased by Havensight Capital, but similar to its online ad product, misrepresents user data, to the tune of 40%. Facebook has since admitted to this alleged tortious over inflation of user data for video ads.  Next, a well respected Financial analyst, who covers Facebook Inc., reports that Facebook has been filing public reports, which are subject to SEC regulation, which states that the user market for online ads is greater than Census populations, in those respective countries.

This is undoubtedly new evidence, which lends support for the veracity of Havensight Capital's claims

that Facebook's misrepresented online ad data, and

harmed Havensight Capital's ability to make actual

online sales.  These two articles taken together,

illustrate a pattern of untruthfulness, and

misrepresentation on behalf of Facebook, in order to

support the rocket like ascension of its stock, at the

expenses of global small business owners.  Such

avarice, here, is gaudy, and demonstrates that Facebook

believes that it is above small business owners, and

that its Trillion dollar size, makes it immune to being

held responsible for its alleged tortious conduct.


<u>**Claims**</u>


I. <u>**Intentional Interference with Prospective**</u>

   <u>**Economic Advantage.**</u>


The tort of intentional interference with

prospective economic advantage has the following

elements: 1) an economic relationship between the

plaintiff, and some third party, with the probability of future economic benefit to the plaintiff, 2) the defendant's knowledge of the relationship; 3) acts on the part of the defendant designed to disrupt the relationship; 4) actual disruption of the relationship, and 5) economic damages. *Ab Group v. Wertin*, 59 Cal. 4th 1022, 1034. In *Korea Supply Co. v. Lockheed Martin*, (2003) 29 Cal. 4th 1134, the Courts, both, at the trial level, and the Appellate level, specifically state that the Defendant does not have to intentionally intend to cause the disruption, but only be the actual cause of such disruption. Thus, this case is actually on point, here. Further, the Court has also held that even negligent knowledge of any such economic relationship can give rise to liability for this tort. See *Buckaloo v. Johnson*, (1975) 14C3d, 815, 830.

First, Havensight Capital, here, has an economic relationship with a third party. Specifically, here, Havensight Capital serves over 200 different respective

store customers, and a cacophony of individual

customers, with a host of consumer products.

Havensight Capital, here, retails its products through

its owned, and operated websites.  The first element is

satisfied, here, through these applied facts.


        Second, the Defendant, here, had, either, actual,

or, constructive knowledge of Havensight Capital's

economic relationships, as Havensight Capital, here,

went on to Facebook to place a business ad.  Facebook,

here, allegedly advertises its business ads products,

as a means to "attract customers."  Thus, Facebook

should have, either, known that the business ads

purchase was for the purpose of continuing to form

contractual relations, either, with customers, or,

Facebook probably should have had constructive notice

of such potential economic interests.  The Plaintiff

also, here, had actual notice of potential economic

relations, as the Plaintiff actually transmitted

business photos, and text onto Facebook's physical

servers, in placing the ad with Facebook.  Thus, the second element of the tort is satisfied, here.  The physical notice created by the ad placement process plead in the facts, here, cannot be denied.


Moreover, third, and, fourth, Havensight Capital, here, alleges that the Defendant disrupted its potential and actual economic relations with customers, and Venture capital firms.  This is because it allegedly grossly inflates the success of its ads, and uses an unfair vertical pricing scheme, which has a 300% variability.  Specifically, Facebook, here, grossly over reported website clicks by over 30%, as shown by the attached screen shots.  *Exhibit B,C,D,E.* There is also evidence that such misrepresentation, here, is a pattern as evidenced by *Exhibits I* and *J.* Havensight Capital, here, would have driven more traffic to its site, and served more customers, here, along with paying less for such advertising services, if the Defendant had not engaged, in the alleged

tortious conduct.  Such actual disruption was a result
of the Defendant's design, here, as the Defendant uses
an alleged fraudulent pricing scheme, which improperly
tracks clicks, and clandestinely prices products after
purchase, as plead in the facts.

Further, the fourth, and fifth element of
disruption, and causation, here, is satisfied by the
alleged facts.  Havensight Capital, here, alleges lost
potential sales, and lost Venture capital funding, as a
result of the website click over inflation, and
defective product pricing scheme.  If Facebook, here,
had not mispresented data, and more customers had
viewed the ads, here, then Havensight Capital might
have accomplished additional actual sales of its
product, such as customers making online purchases of
soccer balls and razors, for example.  Moreover,
damages are also alleged to occur, as Havensight
Capital, here, cites to communications with Lightspeed
ventures, in which capital was not secured, as customer

acquisition data was not deemed to be favorable.

Thus, the Defendant, here, suffered actual monetary

damages.

Further, if the Defendant had not engaged in the

alleged fraud, the Havensight Capital costs would have

been materially reduced, in the first place in

purchasing the ad, thus there are multiple aspects to

economic harm suffered by Facebook's alleged tortious

conduct.  The final damages element of the tort, here,

is satisfied.  The Court, here, should probably find

that the tort of Intentional Interference with Economic

advantage has been committed by the Defendant.


## II.  <u>Unfair Competition and Trade Practices</u>


The tort of Unfair competition and trade practice

is not narrowly constricted to monopolistic behavior.

The Court, here, should take judicial notice that

unfair competition for purposes of the tort is, either,

any event that distorts market equilibrium, or, defined

as, among other things, "any unlawful, unfair or fraudulent business act, or practice and unfair, deceptive, untrue of misleading advertising." *Cal. Bus. Of Prof. Code Section 17200, et seq.* Specifically, the Court, here, should note that while *Eastman Kodak v. Image Technical Services Inc.* 504 U.S. 451, holds that product superiority does not give rise to unfair practices for monopolistic behavior, Facebook's product, here, is not superior, and its monopolistic growth is not solely a function of product superiority. Rather, the Defendant, here,:

**allegedly steals at a rate of close to 40% from customers, allegedly does not test its one product, allegedly operates a defective pricing scheme, and allegedly colludes, with its one trillion dollar competitor, Google.** *Exhibits B,C,D,E,H.*

Moreover, the elements of the tort of Unfair business practices are not restricted at all to monopolistic power, but rather include any unfair business act by any party.  In fact, the unfair element of the tort is further examined, in S*tate Farm Fire Cas Co. v. Superior Court*, (1996) 45 CA 4th 1093, 1104. There the Court states that unfair is defined, as any act that contravenes anti-trust public policy or threatens competition.  It can also be defined by any presentation that is misleading by the Defendant. *Boslina v. Home Loan Center Inc.* (2011) 198 CA 4th 230, 129.  The concept of Unlawful business practices has a broad scope and can be found simply by any act that threatens the law of competition.  *Cal Tech. Communications, Inc. v. Los Angeles Cellular Tel Co.* (1999) 20 C 4th 163, 187.

Havensight Capital, here, alleges facts that independently satisfy the unfair element of this tort, and collectively almost comprehensively represent every

*Complaint*

possible type of violation of this tort.  These
violations are not limited to the Defendant's alleged
monopoly power, but rather encompass a totality of
deceptive schemes, and product defectiveness.  First,
as, in *Boslina v.*, Facebook, here, presents a false and
fraudulent representation, when it improperly reports
and conveys website visits, to the Plaintiff through
its Ad Manager product for the campaigns referenced in
the screenshots.  *Exhibits B,C,D,E.*  This is plead
facts of alleged stealing, around the ad campaigns.

Havensight Capital, here, actually submits screen
shots from various ad campaigns, in 2015, which are
codified in the Statement of Facts that demonstrate
alleged fraudulent conveyances, which is the very
definition of the element of this tort.  *Id*.
Havensight Capital, here, placed these ads, and sent
the business data to Facebook's servers.  The alleged
deceptive and fraudulent website click representations
from Facebook satisfy the unfair element of this tort.

32                      *Complaint*

Havensight Capital, here, can demonstrate damages, and causation, from this alleged misrepresentation of website clicks, as the Plaintiff potentially could have made more sales, gained venture funding, and more efficiently allocated resources, if the alleged tortious conduct had not occurred.

Specifically, here, venture funding was denied by Mr. Liang at Lightspeed Ventures, after Havensight Capital communicated its business acquisition data to him.  Further, Havensight Capital, here, could have sold more products, to more potential customers, having more actual sales, if there had never been a misrepresentation.  There is no dispute, here, that Facebook Inc. made the representations, and operates Facebook Ads manager.  Havensight Capital, here, retails products through its website, and the Plaintiff, here, purchased the business ads for commercial purposes.  Thus, the unfair element is satisfied, along with causation and actual damages.

*Complaint*

Second, the Plaintiff, here, submits evidence of the publicly announced "OCP project," where Google, and Facebook, the two trillion dollar competitors, in the online ad market, are working together to examine their respective server equipment. *Exhibit H*.  The Plaintiff further alleges that the two parties have communicated, on pricing of the online products before.  Also, alleged, here, is that the parties do not take the appropriate steps to safe guard communication on pricing, between the anti-trust competitors.

Third, Havensight Capital now also submits two articles, which independently satisfy the tort of unfair business practices, which includes a singular prong of mis-representation. *Id*.  Facebook, here, was found to have inflated ad click data for video ads, which the Company later admitted to. *Exhibit I*.  This speaks, here, directly to the misrepresentation prong of the Tort. *Bosalina v*.  Additionally, a Financial Analyst found that Facebook publicly mislead investors, here, when it stated that its ad click market was

34                          *Complaint*

larger per person than the actual Census population would allow. *Exhibit J*. Such a statement, here, is inherently unfair and misleading, and lends support to the allegations that Facebook engages in a chronic pattern of this tortious conduct.

These alleged facts support the independent element of the tort of an act that "threatens competition." *State Farm v.* In addition, the Plaintiff, here, does not allege, but states that the same counsel concurrently represents Google, and Facebook in this matter, despite the fact that the two companies, here, are anti-trust competitors. Ms. Kristen Myles, here, purports to be the independent counsel for both of the anti-trust competitors, who are openly operating collaboratively. *Exhibit H*. *Court Record*. This is further evidence of two companies, here, engaging in single operations. The Plaintiff needs a discovery period, here, to more comprehensively review, the

35                                    *Complaint*

alleged facts of collusion between these anti-trust competitors.

Third, the Plaintiff, here, also believes that the prong of unfair conduct is independently met, here, as a result of the Defendant's alleged improper pricing scheme. The Plaintiff alleges, here, that the pricing is based on fraudulent results, as the website clicks data between Google and Facebook does not reconcile across a multitude of ads. Further, the Plaintiff, here, alleges that Facebook's clandestine pricing model, which tells customers the price of products, after they make a purchase, is inherently unfair.

In fact, the Plaintiff has alleged witnessing 300% price differentials, which speaks directly, to unfair pricing. This is a pricing model that is not being driven by a natural market equilibrium, as it should, under California law. This, Facebook's alleged defective pricing scheme alone would rise to the level

of the unfair prong of this tort, which is all that is needed, for it to be satisfied.

Fourth, the Court, here, can find support for the Defendant's unfair business practices, in the two submitted articles. *Exhibit F, Exhibit G*. The fact that the CEO of Facebook, who makes $20 billion dollars a year, allegedly deceptively presents himself to be providing free internet to the indigent, when in fact, he is really trying to sign them up for a limited number of company owned sites, in order to extract revenue, is per se the prong of unfair practices for this tort. *Boslina v*. It is also just disgusting, in general and why large punitive damages are warranted, in this case. Further, the fact that the head of European marketing believes that some of Facebook's online marketing products: are not suitable for retail, defective, and should be disbanded, in his very own words. *Id*. This is further plead evidence of this deception tort. *Id*.

If the Court, here, were to not order discovery, it would likely embolden other trillion dollar companies, to engage with their competitors, and to construct non transparent pricing schemes.  It also would make 300% pricing differentials an acceptable practice.  The Court, here, has a duty to protect the public from trillion dollar companies that allegedly systematically commit fraud, and see redress through boiler plate textual language on their websites, which nobody has actually agreed to as a corporate agent.

Further, all of this alleged tortious conduct for this tort, which satisfies the tort, has clearly caused damages, here, to the Plaintiff, and Facebook, here, is the causation of those damages.  The Plaintiff, here, would likely: pay less for product services, would see transparent pricing schemes, see pricing variability under 25%, as opposed to 300%, and have more online ad placement options, if such alleged improper conduct was

recognized by the Court.  The Plaintiff, here, has plead contractual relations with stores, and customers, all over the world through online sales, along with placing online ads for commercial purposes.  There is no dispute that Facebook Inc., here, is the provider of the products.

Thus, the element of causation and damages has been sufficiently met, here, for the facts plead, which in many cases, each alone, would satisfy one of the unfair prongs of the tort.  Finally, on public policy grounds, this alleged tortious behavior by the Defendant has probably cost the U.S. economy as a whole, trillions of dollars, and millions of lost jobs.  The unjustly earned money, here, rots in Facebook's bloated bank account.

In actual market equilibrium, here, there would be a need for more attorneys, other than the singular Ms. Myles, and a marginal portion of Mark Zuckerberg's $20

billion dollar salary, would probably be allocated to more tech companies offering competing online ad services through more competitive companies.  Thus, the Court, here, should probably find that Facebook's alleged fraudulent conveyances, disproportionate pricing schemes, and collusive behavior, which is codified, here, in presented evidence, should all independently satisfy the tort of Unfair business practices.

### III. <u>Horizontal and Vertical Price Fixing.</u>

The Court, here, should take Judicial notice that *Freeman v. San Diego Assn. of Realtors,* (1999) 77 Cal. App.4th 171, 189, which is exactly on point, here, in this matter for the alleged torts of price fixing. This case reiterates that providers of internet services cannot collude together on price, as it is horizontally per se improper, but it also references, the independent test of vertical price fixing, which

deals with unfair restrictions on, either, quantity, or, capacities. *Id*. The Defendants, in *Freeman v.*, actually committed, both, Vertical, and Horizontal, price fixing, but only one direction needs to be established, to satisfy the tort. *Id*.

Furthermore, the Court should take notice that Vertical price fixing, which is an independent tort, to horizontal price fixing, here, is also alleged to have been committed, and there is an almost patent alleged violation of horizontal price fixing. *Marin Country Bd. Of Realtors Inc. v. Palsson*, (1976) 16 C 3d 920, 930. Vertical price fixing relates to fixing the price from supplier to end customer, as opposed to collusion between suppliers, and generally encompasses restriction of quantities, and manipulation of capacities. Finally, independently, product tying, the requirement to purchase two products together is also a violation. We will apply the alleged facts, to all

three of these independent tests, which result, in a
violation of this very tort.


    First, let's examine the patent Vertical price
fixing.  It is any act, which adversely affects the
marketplace.  *Marin v.  See also Custom Kitchen v.
Owens-Illionis Inc.*, (1987) 191 Ca 3d. 1341.  Moreover,
the Court, in *State of California v. Infineon Tech.*,
2010 WL 3411378, found vertical pricing to have been
committed when a chip maker illegally inflated the
price of their products to their end suppliers.
Havensight Capital, here, has a plead a multitude of
facts, which give rise to this, either, adverse act of
trade, or restriction on quantity test.  Havensight
Capital, here, has plead that Facebook over inflated
website click results across a multitude of online ad
campaigns.  *Exhibit B,C,D,E.*  This over inflation of ad
reporting means that the Plaintiff did not receive the
proper quantity of website visits for his purchase, and
that the Defendant, here, restricted quantity in its

provision of services, and manipulated the capacity of its online ad service, to reach potential customers for the Plaintiff.  The Plaintiff, here, has properly plead that it engaged these online ad services, and witnessed the over inflation, at around 35% across campaigns in early 2015.

Moreover, the Plaintiff also pleads that it witnessed 300% variability in pricing across campaigns, the Defendant, here, charged $.25 a website click for one campaign, and $.70 a website click for the same campaign, placed a few days later.  These plead facts are per se evidence of the Defendant's alleged acts, to over inflate prices, constrain trade, and commit acts that violate the very essence of the tort of Vertical price fixing.

Havensight Capital, here, has alleged that different prices are charged for the same ad campaign, which is really on point, for Vertical price fixing, which is defined, as "unruly different prices for

*Complaint*

similar products and customers." *State of California v.* To ignore these alleged facts, applied to the law, the Court, here, would be encouraging trillion dollar companies in the future, to artificially raise prices, and ship fewer units to customers than they are entitled to, under market equilibrium.

Furthermore, the Plaintiff, here, can establish causation, and actual damages, as it is not at issue whether Facebook Inc. was the service provider of the Facebook online business ad, and it was the Facebook online business ad, which did not deliver as many potential website clicks, and customers, as it allegedly should have, and at an alleged equilibrium transparent, and fair price. The Plaintiff has plead, here, that it has contractual relations with stores, and retails products online through its business ads, and these were, either disrupted, or, not maximized, as a result of Facebook's conduct. Thus, actual pecuniary damages, here, were suffered, as a result of Havensight

Capital purchasing the ads at the allegedly unfair pricing, and accomplishing fewer actual sales of its soccer balls and razors.

Finally, Havensight Capital, also, here, alleges that it failed to secure Venture funding, as a result of this alleged Vertical price fixing, which affected the price of advertising, and the amount of sales that the Plaintiff generated online.  Specifically, here, Havensight Capital contacted Lightspeed ventures, and it was communicated that venture capital funding was denied, as a result of inadequate customer acquisition data.  Havensight Capital, here, has alleged that this data was misrepresented by Facebook, thus Havensight Capital has alleged actual damages through the stated denial of capital funding.

Second, horizontal price fixing, here, is a separate and independent action, within the tort, which deals with the alleged collusion of anti-trust competitors on price. *United States v. Socony-Vacuum*

*Oil Co.*, Inc., 310 U.S. 150 (1940).   *Freeman v.*   The

Plaintiff, here, has properly plead that Google, and

Facebook allegedly communicate about pricing, with

leaders of the respective companies exchanging

information on pricing, and also openly now collude on

online ad service provisions, through the OCP project.

*Exhibit F.*   Anti-trust competitors cannot operate as

one, and such operation is contrary to equilibrium

trade.   *Id*.


    Havensight Capital, and Defendant, here, through

examining servers together, are satisfying the alleged

facts needed to apply for horizontal collusion.

Moreover, the parties, also, share the same independent

counsel, here, Ms. Kristen Myles, even though they are

purported fierce competitors, and their interests are

probably divergent, and could certainly become very

divergent, in discovery.   The Plaintiff, here, has

satisfied causation, and damages, as here, the

Plaintiff has plead that it serves stores with consumer

46                         *Complaint*

products, and placed the Facebook business ad for

business purposes.  The Plaintiff has suffered damages,

here, as the pricing on these ads would probably be

lower, and the Plaintiff would gain more clicks, if the

Defendant had not allegedly colluded with Google, a

property of Alphabet Inc.  Thus, causation, and

damages, here, are satisfied.


Third, Facebook, here, also explicitly violates the

individual price fixing prong of Product Tying, which

is another independent stand-alone test for the tort of

price fixing.  *Freeman v*. Havensight Capital, here,

alleges that the Defendant, here, when the *Complaint*

was originally filed, forced customers to use an

individual Facebook profile, in order to create and

purchase a business ad.  This issue has been resolved

by Facebook, since the filing, but this is per se plead

facts, which apply to product tying.  *Id*.

Further, the customer was forced, here, to consume the individual product and service, in order to obtain the business ad.

**The Court, here, must take Judicial Notice that this product tying of requiring individual accounts in order to place business ads, executed by the Defendant, here, is another compelling reason for the Court not to enforce the allegedly fraudulent boiler plate terms and conditions, which were only agreed to by Mr. Benjamin Woodhouse, before the Plaintiff was even in existence.**

Facebook, here, cannot assign a contract from an individual to a future company that may be born in the future, but even if it could, it should not, here, as this is per se product tying. *Restatement (Second) of Contracts § 317(2) (1981).* *Freeman v.* Facebook, here, cannot argue that it can contract for alleged fraud, even before our company was in existence, and that it should be excused from stealing at close to 35% if not

more, because of such a nonsensical futuristic contraction.  Such asserted conduct by the Defendant is an embarrassment.  Moreover, Havensight Capital alleges that it is restricted from placing multiple product photos, and marketing multiple products, within one purchased ad, which is also per se product tying.  *Id.*

Further, Havensight Capital, here, has satisfied causation and damages for the Product tying. Defendant, here, is the cause, as it is Facebook's policy which required the individual account, to access the business ad.  The Plaintiff, here, has suffered damages because, here, the Plaintiff has been restricted from trade, and from growing its business, with its customers.

Havensight Capital, here, could save costs if it was not restricted from marketing only one product at a time, with each Facebook ad campaign.  Plaintiff has plead, here, that it serves customers all over the World.  This cost savings, here, as a result of alleged

product tying, is inherently sufficient to demonstrate damages.  In conclusion, the Court, here, should find that the Defendant has probably engaged in price fixing, through vertical price fixing, horizontal price fixing, and even product tying.


## IV. **Negligence**


The Court should take Judicial notice that Havensight Capital, here, has plead facts sufficient to demonstrate that Facebook, here, has a duty to Havensight Capital.  Havensight Capital, here, pleads that is transferred data to Facebook Inc. onto its physical servers, in the purchasing and placing of an online business ad.  Thus, Havensight Capital is an invitee, and owed the highest duty of care, not just the normal standard.  *Coats v. Mulji Inn Inc*., 342 S.E. 2d 488 (Ga. App. 1986).  There is absolutely no difference, here, between a restaurant customer walking, into Denny's and slipping and falling, and

bringing her negligence claim, as to Havensight Capital purchasing an ad, and transferring data onto Facebook servers, only to have Facebook allegedly negligently, and fraudulently handle that data.  *Id*.

Furthermore, just because we are dealing with digital commerce in this case, it does not mean the trillion dollar defendant, here, is allowed to allegedly steal from my client, and the Court should not try to remove tort law, in order to protect this careless, and more money than sense Defendant.  The Court should take notice that this physical presence on Facebook's servers is sufficient for premises liability.  *Id*.


The Negligence standard is one of whether the risk outweighs the burden of the prevention or obstruction of the hazard.  *U.S. v. Carroll Towing Co.*, 159 F.2d 169, 174 (1947).  The Plaintiff must also show causation and damages.  Havensight Capital, here, has plead that Facebook allegedly fraudulently conveyed the

*Complaint*

website clicks generated from its business ad, and allegedly does nothing to properly and adequately calibrate its products.

It would seem, as Facebook, here, earns billions of dollars from its lone product that it would not be overly burdensome, here, for the Defendant to check and see if it is stealing at a rate of close to 35% from customers. Havensight Capital, here, has demonstrated causation as Facebook Inc. is the one that provided the ad, and the alleged fraudulent conveyances through its Ads manager product, and that is not at issue.

Further, Havensight Capital, here, has plead damages, as it is a commercial entity that serves over 100 stores, and customers worldwide, and has plead that it relies on online marketing for commercial purposes. Havensight Capital also has plead that it lost Venture capital funding, as a result of the Facebook failing, to take adequate steps to allegedly fix its defective product.

*Complaint*

The plead facts, here, clearly demonstrate that the Facebook had a duty when Havensight Capital placed its data on its servers, and clearly could make more of an effort to test its products.  If such products are allegedly defective, probably damages the global economy, are in the amount of hundreds of trillions of dollars.  For the Court, here, to not allow a Jury to hear on evidence on this tort, would encourage trillion dollar companies, to scale back on testing, and to be even less cautious, with customer data.  The Court, here, should find that the Defendant has been negligent, in the operation and maintenance of its product, and that the filed screenshot evidence is sufficient, to warrant future discovery around this issue, in the interest of protecting the global economy.

## V. <u>Intentional Interference with Contractual Relations.</u>

*Complaint*

First, the elements of the tort are: the existence of a valid contract, Defendant's knowledge of the contract, Defendant acted intentionally, or improperly, and that the Plaintiff suffered damages. *Pacific Gas & Electric Co. v. Bear Stearns Co.*, (1990) 50 Cal.3d 1118, 1126.  Moreover, *Pacific Gas v.,* also stands for the proposition that any constructive notice of contractual relations is sufficient.  Havensight Capital, here, pleads that it has contractual relations with over 150 store customers for its consumer products, which it has valid contractual relationships with, and also a plethora of individual customers through online sales globally.  Facebook, here, had constructive notice, if not actual notice of the contractual relations, when Havensight Capital, here, purchased a business ad, and transmitted business data to the Facebook physical servers.

Conversely, the Court, here, should note that *Pacific Gas & Electric Co. v. Bear Stearns Co.*, (1990) 50 Cal.3d 1118, 1126, here, is also distinguishable, as

the Plaintiff's relations were not changed by the
Defendant's conduct, in that case, and the Court had
already ruled that the Defendant had violated the tort
of Intentional interference with Prospective advantage.
Moreover, the Court, in *Nautical Solutions Mktg. v.
Boats.com*, 2003 WL 2607869 ruled that a website
provider's act, to re-direct online traffic from one
business to another, satisfied the tort of *I.I.C.R.*
The Court, there, also, noted that it was not important
whether act was intentionally harmful, only that the
Defendant's actual intention caused the act, and was
the cause of the re-direction of online traffic from
one website to another.

Nautical Solutions Mktg. v., here, is directly, on
point.  Facebook, here, in this case, either,
misrepresented, or mis-directed online traffic to
Havensight Capital's business website, and thus can be
liable for the tort in question, and has satisfied the
element of an intentional act.  Havensight Capital has
plead inaccurate data transmittal across multiple

55                        *Complaint*

campaigns, and filed Exhibits of such inaccuracies. *Exhibit B,C,D,E.*


    The Plaintiff pleads that the Defendant markets the product, as a business ad and for the purpose of attracting customers, thus even if the physical presence of data did not give notice, Facebook, here, had constructive notice of the contractual relations, between Havensight Capital and its website customers. Facebook, here, could try to argue the element of actual interference, if it could prove that Havensight Capital, here, did not lose sales, as a result of the Facebook's alleged fraudulent conveyances, and defective product.  Facebook failed to produce the proper number of website clicks, here, as alleged in the plead over inflation reported from each ad campaign.


    Thus, Havensight Capital was unable to make more sales, and create more contractual relations with

*Complaint*

customers.  Whether the actual customers, here, would

have purchased the products, is an issue for the jury,

and not a point of dispute on a pleading basis for the

Court to grant a dismissal, in this case.  Moreover,

the causation and damages elements are met, here, as it

was Facebook that allegedly failed to deliver the

accurate number of website clicks, and there is no

issue, here, that it was Facebook who provided the ad.


Further, there is also an interference with the

contract created between Facebook and Havensight

Capital, upon the placing of the ad, through the plead

alleged defective pricing scheme of Facebook.

Havensight Capital, here, has plead witnessing 35% over

inflation discrepancies, and 300% price variability

across online business ad campaigns.  These plead facts

are sufficient, to show constructive knowledge of

contractual relations and actual interference.  These

plead facts of over inflation are directly analogous to

the mis-direction of data, in *Nautica Mktg. v.*

57                         *Complaint*

Finally, damages, here, are satisfied, as the Plaintiff has plead lost sales, and lost Venture funding, as a result of the Defendant, here, over inflating results, and not delivering the proper website visits, at a market equilibrium price.  These damages are alleged as Havensight Capital did not sell as many consumer products such as soccer balls, and razors as it could have, if the business ad, here, had generated the appropriate number of website clicks.

Further, Havensight Capital has specifically plead communicating with a Venture capital leader, in citing to communications with Lightspeed personnel, in its Statement of Facts.  Havensight Capital, here, was unable to secure capital as a result of Facebook's alleged tortious interference.  Thus, the Court, here, should find that damages are sufficiently plead and that the alleged tort of *I.I.C.R.*, here, has been committed.

## VI.  <u>Civil Rico</u>

Facebook, here, should probably be found liable for the alleged tort of *Civil Rico*. *Civil Rico* is codified in *18 U.S.C. Section 1964*, and only an alleged act of either, conspiracy, or, racketeering has to be stated for a claim to be properly asserted, along with causation and damages. Furthermore, only a single act has to be alleged to meet the pattern of racketeering activity prong, and a preponderance of evidence standard, here, is applied by the Courts. *Liquid Air Corp. v. Rogers*, 834 F 2d 1297 (7th Cir. 1987)(Single scheme and singular act sufficient for a Defendant to have committed *Civil Rico*). *Wilcox v. First Interstate Bank of Oregon*, 815 F. 2d 522, 531 (9th Cir. 1987).

Moreover, the Court has also found that the damages element of the tort, only has to be alleged and can be inherently found in any singular act, which is committed by the Defendant. *Simon Oil Co Ltd. v. Norman*, 789 F. 2d 780 (9th Cir. 1986). Havensight Capital, here, has alleged that Facebook has engaged in a singular act of racketeering through a multitude of

acts.  First, Facebook utilizes an imprecise pricing scheme, which here, provided Havensight Capital with pricing of ads with a 300% deviation.  Second, Facebook, here, misrepresented the number of website visitors that viewed a set of purchased ads.  This is alleged and demonstrated by the attached screenshots, here, which show a discrepancy between the number of views that Google Analytics recorded, and that Facebook Ads manager recorded.  *Exhibits B,C,D,E.*

Third, Facebook demonstrates a pattern of this conspiracy, as Havensight Capital, here, has discovered new evidence, which sheds light on this particular pattern.  In *Exhibit I*, here, it is demonstrated that Facebook admits to inflating views on its Video ad product.  Additionally, in *Exhibit J*, it is demonstrated that Facebook has been misrepresenting the market for ads to its investors, and providing data that far exceeds the actual human population.

Moreover, this newly discovered evidence taken together lends support for a pattern of misleading the

public by Facebook.  Clouded by its own avarice, Facebook has engaged in single acts of racketeering, which amount to *Civil Rico*, in an attempt to grandiose the success of its website ad product.  Such conduct is motivated by a desire to fradulently bolster Facebook's share price, and make billions of additional dollars of profits for its Barron Executives, at the expense of small business owners.

Fourth, Havensight Capital, here, has alleged that Facebook and Google work together, as evidenced by the article on the OCP project, on pricing schemes. *Exhibit F*.  The nature and extent of this alleged communication needs to be examined, and further discovery will aid in understanding the specifics of such communications.  The submitted article alone, here, is also a singular act of conspiracy, however, and the Court, here, should allow such discovery to see if this alleged further collaboration has also satisfied the singular prong of the tort of *Civil Rico*.

Furthermore, this case is analogous, here, to *Liquid Air v.,* where an employee falsified documents and conspired with a competing Company to overstate the number of air drums returned, in an Air drum leasing arrangement.  Leaders of Facebook, here, in this case, also conspired to over inflate website click data, in order to more favorably profit from the Ads purchase arrangement that Havensight Capital, and Facebook entered into on the dates specified, in the Statement of Facts.  Havensight Capital also alleges multiple instances of this over inflation, here, and now presents newly discovered evidence of a pattern of behavior.  *Wilcox v.* (Collateral Estoppel not applicable to claim of Civil Rico).  Only a single act, however, here, is required to satisfy the tort.  *Id. Liquid Gas v.*

Finally, Havensight Capital, here, has sufficiently alleged causation, as it has identified Facebook as the author of the attached Ads manager results, and the party which it properly entered into an ad purchase

arrangement with, here.  Havensight Capital, here, has also properly alleged damages, here, as it has alleged that it could have potentially sold more consumer products, such as soccer balls and razors, if the website data had not been overinflated, and more potential consumers had clicked on the ad.  Havensight Capital also alleges that it had communications with Venture leaders, and that these communications were affected by improper customer acquisition data.  This caused Havensight Capital to lose venture funding, and is an allegation alone, which is sufficient to meet the damages element of the tort.

Moreover, in fact, here, the very over inflation of the website ad click data also likely affected the budget which Havensight Capital allocated for online ad spending. Thus, the purchase amount alone, here, which was affected by the alleged Facebook misrepresentations, and alleged singular acts of conspiracy, are allegations of inherent economic loss, and damages.  In conclusion, the Court, here, should

allow a Jury to hear evidence on these tortious allegations of Civil Rico, which have serious economic and social consequences for almost all small business owners in America.

### VII. Conclusion

In conclusion, the Court, here, should probably find that Facebook has committed the torts of alleged: *Civil Rico, Price fixing, IICR, IIPER, Negligence, and Unfair business practices*.  Havensight Capital, here, has properly plead facts for these torts, and even submitted physical evidence, which demonstrates that Facebook has allegedly an improper pricing mechanism, and an alleged defective product.

Moreover, Facebook, and Google engage in alleged singular operations, and alleged public collusion, along with concurrent legal representation.  These alleged facts give rise to all of the alleged torts. Finally, the newly discovered evidence submitted, here,

demonstrates that Facebook's alleged tortious conduct
is a pattern of behavior.  Thus, the Court, here,
should affirmatively protect the public by allowing
discovery into this conduct, which have substantial
global economic consequences.


### VIII.   <u>**Request for Jury Trial**</u>


The Plaintiff, here, requests the Court to grant a
Jury trial pursuant to *FRCP Rule 38* and the *Seventh
Amendment of the United States Constitution*.


### IX.  <u>**Request for Relief.**</u>


Havensight Capital seeks $490.61 million in
compensatory damages for the damage to business
property, and the taking of all of its business lines,
along with the damage to all existing and potential
customers.  Also, in *Waits v. Frito Lay, Inc*. 978 F.2d
1093 (9th Cir. 1992), the Court held that punitive

damages are available where it is proven that Facebook is guilty of, either, fraud, or, malice.  The Facebook, here, clearly engages in Fraud through its alleged defective pricing schemes, and alleged defective fraudulent conveyances, about website click data generated from its business ads.  For this alleged predatory pricing approach, and reckless endangerment of the U.S. economy, punitive relief should be in the amount of $480.28 million, and a total of $970.89 million should be awarded in both compensatory and punitive damages to Havensight Capital.

Respectfully submitted,

/s/ Benjamin Woodhouse
Mr. Benjamin Woodhouse esq.
Havensight Capital LLC
2369 Kronprindsens Gade,
Suite 8-309
Charlotte, VI. 00802
805 478 1958
California Bar #261361

66                          *Complaint*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Complaint*